UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re:

CROSS MEDIA MARKETING                        Chapter 11
CORPORATION, ET AL.,                         Case No. 03-13901 (BRL)
                                              (Jointly Administered)



                                    Debtors.
-------------------------------------------------------x
In re:

CROSS MEDIA MARKETING
CORPORATION and MEDIA
OUTSOURCING, INC.,
                                             Adv. Pro. No. 05-03060(MG)


                            Plaintiffs,


                v.


CAB MARKETING, INC. d/b/a
COMMUNITY READING CLUB OF
CANTON and CAROL BOLAK,



                            Defendants.
-------------------------------------------------------x

**APPEARANCES:**

STORCH AMINI & MUNVES PC
Attorneys for Plaintiffs
2 Grand Central Tower, 25th Floor
New York, NY 10017
By:     Kevin Fritz, Esq.

WANDER & ASSOCIATES, P.C.
Attorneys for Defendants
641 Lexington Avenue, 21st Floor
New York, New York 10022
By:     David H. Wander
        Steven I. Super

**MARTIN GLENN**
**United States Bankruptcy Judge**

## <u>MEMORANDUM OF OPINION</u>

This adversary proceeding, easily resolved once the merits are reached, presents a thicket of legal issues – post-confirmation subject matter jurisdiction, *res judicata* and other equitable defenses (and whether those unpleaded affirmative defenses were waived), standing to assert the claims contained in the complaint, amendment of the pleadings pursuant to FED. R. CIV. P. 15 to conform to the pretrial order and proof, and choice of law – that must be cleared away before the merits of the claims can be reached. The plaintiffs, Cross Media Marketing Corporation and its wholly owned subsidiary, Media Outsourcing, Inc. (collectively, "Cross Media" or the "Plaintiff"), were debtors in a chapter 11 case filed in this Court on June 16, 2003. A liquidating chapter 11 plan was confirmed on May 19, 2004, and became effective on July 23, 2004.[1] The case has not yet been closed however.

On October 20, 2005, Cross Media commenced this adversary proceeding against CAB Marketing, Inc. and Carol Bolak (collectively the "Defendants"). The Plaintiff alleged that Defendants misappropriated Plaintiff's customer lists and other trade secrets, engaged in unfair competition through deceptive marketing, tortiously interfered with Plaintiff's existing and prospective business relations, were unjustly enriched by the misappropriation of the customer lists, and that Carol Bolak, formally employed by Cross Media, diverted corporate opportunities and breached her duty of loyalty to Plaintiff. In

---

[1]    Under the confirmed Plan, Media Outsourcing, Inc. merged into Cross Media Marketing Corporation, and thus did not exist as a separate entity when the adversary complaint was filed. As explained in Section D, *infra* at 22-23, Cross Media is referred to in the Plan as "Reorganized Cross Media," but it is merely a continuation of the pre-existing corporate entity. Therefore this Court refers to the two merged entities as "Plaintiff."

the joint pretrial order Defendants raised two issues of law, contending that Plaintiff

lacked standing to bring these claims and that Plaintiff's claims were barred by the

doctrines of *res judicata,* judicial estoppel and/or equitable estoppel.  The Court

conducted a two-day trial on December 4 and 5, 2006.  Thereafter, the parties submitted

post-trial briefs, and on February 7, 2007, the Court heard closing arguments.  The

following constitute the Court's findings of facts and conclusions of law pursuant to FED.

R. CIV. P. 52(a) made applicable to this adversary proceeding by FED. R. BANKR. P.

7052.

> For the reasons provided below, the Court holds that (1) the Court has "related to"

subject matter jurisdiction under 28 U.S.C. § 1334(b) over this post-confirmation

adversary complaint, (2) the claims asserted in the adversary complaint are not barred by

*res judicata* or any equitable defenses, (3) Cross Media has standing to pursue the claims

asserted in the adversary complaint, (4) Cross Media's motion to amend the adversary

complaint to conform to the pretrial order and to the evidence presented at trial is granted,

and (5) New York law will be applied to all claims and defenses.  Reaching the merits,

however, the Court concludes that Cross Media has failed to prove any of its claims by a

preponderance of the evidence.  Therefore, Defendants are entitled to have judgment

entered in their favor on all claims.  After describing the background facts, this opinion

deals with subject matter jurisdiction, *res judicata* and equitable defenses, standing, the

Rule 15 motion to amend the adversary complaint, choice of law, and, finally, the merits

of the claims, in that order.

## I.   BACKGROUND[2]

Cross Media, primarily through telemarketing, sold magazine subscriptions to consumers who purchased "bundles" of several magazines with subscription periods ranging from one to four years. (PTO at 3). Cross Media also engaged in the business of renewing these subscription bundles for those customers whose subscriptions were about to expire (the "Renewal Business"). Through the course of its business, Cross Media compiled lists of its customers, which included confidential customer information including: the customer's name, address, origin of the source lead, credit or debit information, titles of magazines the customer subscribed to, current subscriptions up for renewal and other miscellaneous information (the "customer lists"). (PTO at 3). The software used to compile the customer lists was unique to Cross Media's magazine business and access to the customer lists was protected by a three-tier security structure that only certain employees had access to based on their role in the company. (Tr. (12/4) at 70, 71).

A separate part of Cross Media's business involved the acquisition and sale of potential customers, known in the industry as "leads." (PTO at 3). Leads provide the key contact information for customers, to try to sell magazine subscription bundles. (Tr. (12/4) at 65). Cross Media acquired leads through third parties and either contacted the leads or sold the leads to independent telemarketing dealers who contacted the potential consumers directly. (Tr. (12/4) at 65; PTO at 3). If the independent dealer made a magazine subscription sale through a lead provided by Cross Media or another lead

---

[2]     The following conventions are used in citing to the trial record. The daily transcript is cited by date and page. For example, "Tr. (12/4), at 7" refers to page 7 of the December 4, 2006 transcript. 'PX' refers to the Plaintiff's trial exhibits and "DX" refers to the defendants trial exhibits. The Joint Pre-Trial order will be cited as "PTO."

source, the dealer would then "clear" the sale through Cross Media or another

clearinghouse and would receive a commission on the sale.  (Tr. (12/4) at 65-66; PTO at

3).

The customer lists differ from the leads lists, as the customer lists provide

information about unique attributes of the customer after the customer has gone through

the entire sales process.  (Tr. (12/4) at 67).  For example, the customer lists include key

contact information about the customer, payment method, as well as the particulars of the

magazine bundle, whether or not the customer accepted a cross sale, an up sale, or down

sale offer of a magazine bundle.  (Tr. (12/4) at 67-68).  Leads lists contain the customer

name, the customer's contact information, possibly a credit card number, where the lead

originated from, and any costs associated with the lead.  (Tr. (12/4) at 65, 84-85; Tr.

(12/5) at 10-12).

## Carol Bolak's Employment at Cross Media

Carol Bolak ("Bolak") was employed by Cross Media and its predecessor entity

for over ten years.  (PTO at 5).  Bolak served as a lead broker for Cross Media until her

termination in February 2003.  (PTO at 5).  As a lead broker, Bolak's responsibilities

included contacting other lead brokers from whom Cross Media purchased names of

potential magazine subscribers, managing the list of potential magazine subscribers,

determining which entities were not viable leads, and distributing a revised list to dealers.

(PTO at 5).  In February 2003, Bolak was released from employment at Cross Media. [3]

(Tr. (12/5) at 57).

---

[3]       Bolak was terminated for suspected theft of leads due to correspondence that had been monitored
on Bolak's computer between Bolak and Donnie West, a former Cross Media employee.  (Tr. (12/5) at 62-

In October 2002, while still employed at Cross Media, Bolak formed CAB

Marketing, Inc. ("CAB"), but CAB did not conduct business until after Bolak's

termination from Cross Media.  (Tr. (12/5) at 64).  Bolak formed the corporation because

she recognized that Cross Media was having financial difficulties and could soon go out

of business.  *Id.*  Bolak formed CAB for the purpose of conducting business as a lead

management company for acquiring and selling leads, (Tr. (12/5) at 65), and the company

also did business as Community Reading Club of Canton, for the portion of the business

that cleared magazine orders for independent dealers.  (PTO at 8; Tr. (12/5) at 68-69).

### Brad Barlow & the BCM Partnership

Beginning in 2000, Brad Barlow became the director of sales at Cross Media, and

his duties included overseeing the renewal department.  (PX 9 at 10).  In June 2003, when

Cross Media initially closed its renewal department upon filing for bankruptcy protection,

Barlow was terminated along with the rest of the sales department.  (PTO at 6, 9).  In the

summer of 2003, after Barlow had been laid off, Carol Bolak, Marcella Jones (another

former Cross Media employee), Brad Barlow, and Robert Bolak (an independent dealer),

discussed forming a partnership called "BCM."  (PTO 8-9; Tr. (12/5) at 23).  The

partners agreed to divide profits equally, each receiving 25%, and attempted to hold

regular meetings.  (PTO at 9; Tr. (12/5) at 24).  The purpose of this business was to

obtain potential renewal orders from Tom Meehan, an independent magazine dealer.  (Tr.

---

63).   After meeting with Andrew Nelson, the person Bolak directly reported to at Cross Media, and
explaining the communication, Nelson assured her that she was not let go for theft and promised to correct
the miscommunication.  (DX L at 23).

(12/5) Jones testimony unavailable);[4] (Tr. (12/5) at 76). Meehan sent leads to CAB and

CAB forwarded these leads to Barlow who was in charge of contacting the potential

customers. (Tr. (12/5) at 25-28). Barlow would then forward any sales to CAB to

"clear" the orders. (Tr. (12/5) at 26-28). Jones contributed to the partnership through her

involvement in back office operations at CAB, and she also obtained additional renewal

orders from her industry contacts. (Tr. (12/5) at 28). Robert Bolak contributed his

customers from CRC of Canton, and Carol Bolak held the contract with PPSB, which

allowed them to clear orders. (Tr. (12/5) at 28).

In July 2003, when Cross Media decided to reopen its renewal department, it

rehired Barlow to again manage the department. (PTO at 6, 9). Between June 2003,

when Barlow was terminated by Cross Media, and July 2003 when Barlow was re-hired,

Barlow hired key Cross Media employees including Rennie Abrams to work for a

company that he later incorporated as "A Magazine Café."[5] (PTO at 9). When Barlow

was re-hired by Cross Media he did not disclose his involvement with A Magazine Café.

(PTO at 9). While Barlow worked at Cross Media, Rennie Abrams ran A Magazine

Café's day to day operations. (Tr. (12/5) at 78).

The purpose of A Magazine Café's operations was to contact the potential

renewal orders that Barlow received from CAB, pursuant to their agreed venture. (Tr.

(12/5) at 27-28). Barlow also obtained cold leads from independent sources and

contacted them, although this was not part of the original plan contemplated by BCM.

---

[4]    The testimony on the second day of trial, on December 5, 2006, was recorded through the court's
ECRO system. The electronic sound file was corrupted and the recorded testimony could not be retrieved.
All references to this testimony are made based on the Court's notes from that morning or from the parties
recollections.

[5]    Barlow incorporated A Magazine Café on August 8, 2003. (Px. 9 at 24).

(PX 9 at 35).  Problems soon arose between Barlow and the other BCM partners.  Barlow

had attempted to independently acquire a PPSB license, and he was obtaining leads from

sources other than CAB, in contravention of the partnership agreement.  (Tr. (12/5) at

79).  In March or April 2004, the remaining partners – Carol Bolak, Marcella Jones, and

Robert Bolak – stopped sending potential renewal orders to Barlow and severed their

business relationship with him.  (Tr. (12/5) at 82).


**Discovery of Misappropriation**

Cross Media began experiencing financial difficulties in 2002, and on June 16,

2003, it filed for bankruptcy protection.  (PTO at 4-5, 6).  Upon commencement of the

bankruptcy case, Cross Media closed its entire sales and marketing department,

terminated its sales force and reduced the number of employees from 750 to 40.  (PTO at

6).  Cross Media maintained only those employees needed to collect the remaining

accounts receivable, manage its renewal portfolio, and wind-down the company's affairs.

(PTO at 6).  Initially, as part of the wind-down process, Cross Media closed its magazine

renewal department.  But, in July 2003, Cross Media reopened its renewal department,

rehired Barlow as its manager, and directed all of its marketing efforts toward its renewal

business, until February 2004 when the department was again closed.  (PTO at 7).

Members of the renewal department had direct access to those customers whose

accounts receivables had matured.  (Tr. (12/4) at 77).  Upon successful collection of the

accounts receivable from a current customer, the customer's name would return to the

queue and a member of the renewal department would call the customer in attempts to

renew the customer's subscription.  *Id.*  As head of the renewal department, Barlow had

direct access to the renewals and reclamations[6] modules of the customer lists. (Tr. (12/4)

at 78). However, Barlow's access was limited to printing each lead individually and his

access did not allow him to download all of the customer lists. (Tr. (12/4) at 78-79).

During the relevant time period, from 2002 to 2004, Barlow was never suspected of any

wrongdoing or improper conduct. (Tr. (12/4) at 81).

However, in June 2003, Cross Media discovered that an anonymous party was

attempting to auction its customer lists on the internet. (PTO at 6); *Cross Media Mktg.*

*Corp. v. Nixon,* Adv. Proceeding No. 03-08278 (ECF Doc. No. 69) (Bankr. S.D.N.Y.

April 6, 2006), *aff'd,* No. 06 Civ. 4228, 2006 WL 2337177 *1 (S.D.N.Y. Aug. 11, 2006).

The auction was linked to an email account held with Yahoo!, and after extensive

investigation, the unauthorized auction was linked to Michael Nixon and his wife Marie

Labesky Nixon. (PTO at 5-6). Mr. Nixon had previously entered into a consulting

agreement with Cross Media in January of 2002, and at that time was given full access to

Cross Media's customer lists. *Id.* After trial against Marie Nixon,[7] Judge Lifland found

that Mrs. Nixon misappropriated Cross Media's trade secret when she either auctioned or

conspired to auction the customer lists; that Nixon had converted Cross Media's property;

and that Nixon had been unjustly enriched because she benefited from access to the

customer lists she did not bear the cost of developing. *Cross Media Mktg. Corp. v.*

---

[6]     A reclamation order is an order that was submitted for verification, but during the verification
process the customer chose to cancel the order – typically because the order was too expensive. (Tr. (12/4)
at 125-26). A representative would attempt to contact the customer again and reclaim the customer by
configuring a smaller magazine bundle at a less expensive price. (Tr. (12/4) at 126). These reclamation
order forms would have included credit card information and the magazines that the customer had initially
selected. *Id.* at 127.

[7]     The adversary proceeding went forward against Marie Nixon only because prior to trial Michael
Nixon filed for bankruptcy protection, staying the action against him pursuant to § 362 of the Bankruptcy
Code. On the morning of trial, the Bankruptcy Court granted Cross Media's oral motion to sever the action
against Michael Nixon and the action proceeded against Marie Nixon. *Cross Media Mktg. Corp. v. Nixon,*
2006 WL 2337177, at *2.

*Nixon,* Adv. Proceeding No. 03-08278 (ECF Doc. No. 69). The Bankruptcy Court

awarded Cross Media $236,000 in compensatory damages and $50,000 in punitive

damages.[8] (PTO at 6). On appeal, Judge Mukasey affirmed the Bankruptcy Court's

findings in all respects and denied Marie Nixon's motion for a new trial. *Cross Media*

*Mktg. Corp. v. Nixon,* 2006 WL 2337177, at *1.

In August 2003, during routine calls to renewal customers, notifying them of a

promotion and advising them that their subscriptions were due for renewal, Cross Media

discovered that third-party competitors had already contacted its customers seeking to

secure their renewal business. (PTO at 7). During this period, numerous Cross Media

customers declined to renew their subscriptions with Cross Media because they believed

that they had already renewed these subscriptions with Cross Media, when they had in

fact renewed with another entity. (PTO at 7). These customers informed Cross Media

that these representatives knew the exact magazines to which they had subscribed, knew

their personal identification information, and some customers indicated that the

representatives possessed their credit card information. (PTO at 7). Additionally, some

customers indicated that these entities had invoiced or charged customers amounts that

had clearly exceeded the limit that Cross Media representatives were authorized to

charge. (PTO at 7). The information that these representatives possessed was not

publicly available, but was something that was maintained in Cross Media's customer

lists.[9] (PTO at 7).

---

[8]    In computing the actual damages, the Court found that the customer lists contained 944,000
customers and each lead cost Cross Media $0.25 to develop. (PTO at 6). Therefore, Cross Media was
entitled to $236,000 in compensatory damages.

[9]    No evidence was presented at trial further identifying these customers, or indicating that these
customers were contacted by CAB or by an entity related to CAB.

At trial, in an attempt to link this misconduct to Defendants, Plaintiff presented the testimony of Sandy Frey ("Frey"), a former Cross Media customer. In Spring 2004, after Cross Media closed its renewal department, Frey received a call from A Magazine Café, claiming to be her "magazine subscribers." (Tr. (12/4) at 20). Frey was told that she had won three years of magazine subscription service, but that she would have to pay for one year to receive the additional three years for free. (Tr. (12/4) at 20). After agreeing to the transaction, Frey was transferred to a third-party agent and was asked additional questions. *Id.* The entity already had Frey's credit card information, phone number and address on record, but it did not know the magazines that Frey had previously ordered from Cross Media. (Tr. (12/4) at 20). Frey testified that she thought that she was speaking with MOS. (Tr. (12/4) at 21). On April 13, 2004, Frey's credit card was charged $24.57 by CRC of Canton. (PX 2 at 489). After receiving this charge Frey contacted CRC because she was unaware of who they were and Frey testified that they identified themselves as her magazine subscription service. (Tr. (12/4) at 22). After reviewing her previous credit card statements, Frey contacted MOS and informed them of the call that she had received from CRC. (Tr. (12/4) at 22-23). Frey ultimately cancelled her subscription with CRC because they were not affiliated with MOS and she received a full credit for the charge. (PX 2 at 490; Tr. (12/4) 20-29). At closing argument Plaintiff admitted that MOS did not suffer any damage with regard to the loss of Frey's business because this transaction occurred after Cross Media had closed its renewal department. (Tr. (2/7) at 32). To date, Frey is the only customer that Plaintiff has identified who was contacted by an entity connected to the Defendants.

In October 2005, Cross Media sold approximately 391,000 customer accounts (extracted from the customer lists) with open receivable balances to Cavalry Portfolio Services ("Cavalry"). (PX 26 at 11; PX 27). Plaintiff has been unable to access its original customer lists with all of its 944,000 customers, which would indicate those customers who had paid in full and were not delinquent. (PX 26 at 20). CAB's customer list of 1,450 names was compared against the 391,000 names sold to Cavalry, and seven customers with matching names and addresses were found to be on both lists. (PX 26 at 18-25).

## II.   DISCUSSION

### A.  Subject Matter Jurisdiction

This adversary proceeding, which alleges pre- and post-petition misconduct by Defendants, was brought after the confirmation of the Plaintiff's confirmed chapter 11 liquidation plan. Although the parties have not challenged the Court's jurisdiction in this proceeding, the court has an obligation to inquire *sua sponte* into its subject matter jurisdiction. *In re Recticel Foam Corp.*, 859 F.2d 1000, 1002 (1st Cir. 1988). The Plaintiff's confirmed chapter 11 plan is a liquidation plan. Therefore, the Court retains jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b). *See Boston Reg'l Med. Ctr., Inc. v. Reynolds ( In re Boston Reg'l Med. Ctr, Inc.),* 410 F.3d 100, 106-07 (1st Cir. 2005) (holding that the court's jurisdiction does not diminish post confirmation if the debtor, pursuant to a liquidating plan, seeks to commence litigation to collect the debtor's assets for the benefit of its creditors).

In the pleadings and the joint pretrial order the parties disputed whether the matter before the Court was a core proceeding pursuant to 28 U.S.C. § 157(b)(2). However, on

the second day of trial, on December 5, 2006, the parties stipulated, pursuant to 28 U.S.C.

§ 157(c)(2), that the court could hear and determine the matter and enter appropriate

orders and judgments, obviating the need to decide whether the matter was a core

proceeding.


### B. Unpleaded Affirmative Defenses

Defendants now contend that Plaintiff's claims are barred by *res judicata* by

virtue of the Plaintiff's confirmed chapter 11 plan, which Defendants assert did not

expressly preserve the claims against Defendants in this adversary proceeding.

Defendants waived the *res judicata* defense by failing timely to assert it in their answer

or amended answer.  Under Federal Rule of Civil Procedure 8(c), made applicable by

Rule 8 of the Federal Rules of Bankruptcy Procedure, parties are required to raise

affirmative defenses, such as estoppel and *res judicata*, in the pleadings.[10]  Fed. R. Civ.

P. 8(c).  It is a generally accepted principle that a party's failure to plead such affirmative

defenses results in the waiver of those defenses.  5 Charles Alan Wright & Arthur R.

Miller, FEDERAL PRACTICE & PROCEDURE § 1278 (3d ed. 2006) (cases collected); *see

also Arizona v. California*, 530 U.S. 392, 394 (2000) (stating that "res judicata [is] an

affirmative defense ordinarily lost if not timely raised").  However, the Second Circuit

---

[10]     Rule 8(c) provides in relevant part:
         In pleading to a preceding pleading, a party *shall set* forth affirmatively accord and satisfaction,
         arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy,
         duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license,
         payment, release, *res judicata*, statute of frauds, statute of limitations, waiver, and any other matter
         constituting an avoidance or affirmative defense.
Fed. R. Civ. P. 8(c) (emphasis added).

recognizes an exception to this waiver when the affirmative defense was initially

unavailable, "is raised at the first pragmatically possible time and applying it at that time

would not unfairly prejudice the opposing party." *Rose v. AmSouth Bank of Florida*, 391

F.3d 63, 65 (2d Cir. 2004) (quoting *Am. Fed. Group, Ltd. v. Rothenberg*, 136 F.3d 897,

910 (2d Cir. 1998)).  Courts have been willing to accommodate the defendant where the

defense of *res judicata* was not available at the pleading stage**.**  *Gonzalez v. City of New

York*, 396 F. Supp. 2d 411, 421 (S.D.N.Y. 2005) (stating that "[w]hen [*res judicata* is]

not available at the pleading stage because the prior action has not yet finished, the rule

is more flexible [and courts] . . . have allowed parties to raise the defense on motion for

summary judgment, as long as the plaintiff has adequate opportunity to respond to the

defense") (quoting *Morrison v. Blitz,* No. 88 Civ. 5607, 1995 WL 679259, at *3

(S.D.N.Y. Nov. 15, 1995)).

In *Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 46-48 (2d Cir. 1983), the

Second Circuit reversed the district court's decision to grant defendant leave to amend its

answer to assert a claim for *res judicata* because the defendant failed to establish good

cause for the delay in asserting the *res judicata* defense and permitting an amendment at

such a late date prejudiced the plaintiff.  In reaching this ruling, the court observed that

"any delay in asserting an affirmative defense for a significant period of time will almost

invariably result in some 'prejudice' to the nonmoving party. . . .  [T]he proper standard

is one that balances the length of the delay against the resulting prejudice." *Evans*, 704

F.2d at 46-47 (quoting *Advocat v. Nexus Indus., Inc.,* 497 F. Supp. 328, 331 (D. Del

1980)).  The court further noted that the nonmoving party's showing of prejudice would

be lessoned based on the length of the unexplained delay.  *Id.*  In *Evans*, the defendant's

14

request for leave to amend to assert a *res judicata* defense was clearly dilatory and was unduly delayed because defendant failed to seek leave to amend until two years and nine months after the defense became available, six days before trial and after two pre-trial conferences.

In the instant case, Defendants failed to raise any affirmative defenses until the eve of trial.  It was not until November 29, 2006, only days before trial, that Defendants first raised the affirmative defense of *res judicata*, judicial estoppel, and/or equitable estoppel in the Joint Proposed Pre-Trial Order submitted to the Court.  Defendants did not move to dismiss these causes of action until December 4, 2006, the first day trial.  Defendants failed to raise these affirmative defenses in the answer or the amended answer, dated December 28, 2005, one year prior to the submission of the Joint Pretrial Order.  Further, Defendants amended answer only contained a general defense for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and a general equitable defense stating that the "[p]rinciples of waiver, estoppel, laches and equity provide Defendants a defense to the cause of action alleged in the complaint."  (Amend. Answer ¶¶ 69, 71); *see Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003) (holding that a general defense for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is insufficient to preserve an enumerated affirmative defense under Rule 8(c) because "[o]ne of the core purposes of Rule 8(c) is to place the opposing parties on notice that a particular defense will be pursued so as to prevent surprise or unfair prejudice").  Additionally, although Defendants purported to reserve "the right to amend their answer to assert different and additional defenses," (Amend. Answer ¶ 72), Defendants never sought leave from the court to amend the answer to raise these affirmative defenses.

15

Therefore, unless Defendants can assert that the affirmative defenses now being alleged were not available at the pleading stage, Defendants failure to plead these defenses should result in a waiver.[11]

The affirmative defenses that Defendants now seek to assert were available at the pleading stage. Defendants' *res judicata* defense is based on the assertion that Plaintiff failed properly to preserve all claims against Defendants in its confirmed chapter 11 plan. Plaintiff's chapter 11 plan was confirmed on May 19, 2004, approximately one year and five months before this action was commenced. As such, Defendants cannot allege that the *res judicata* defense was unavailable at the commencement of this litigation. Accordingly, on the eve of trial and almost one year after Defendants submitted their amended answer, to allow Defendants now to raise these defenses, would unduly prejudice the Plaintiff. *See Evans*, 704 F.2d at 47 (asserting that "the proper standard is one that balances the length of the delay against resulting prejudice" to the nonmovant).

## C. *Res Judicata* Does Not Bar the Claims

Even if Defendants timely plead the defense of *res judicata*, Plaintiff's claims would survive dismissal because the elements of *res judicata* have not been met. *Res judicata* precludes the parties from re-litigating claims if the earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case

---

[11]     In footnote 4 of Defendants trial memorandum, Defendants cite to the Eleventh Circuit to support the proposition that failure to assert an affirmative defense in an answer can be cured by inserting the defense in the pretrial order. *Pulliam v. Tallapoosa County Jail*, 185 F.3d 1182, 1185 (11th Cir. 1999) (stating that "omission of an affirmative defense is not fatal as long as it is included in the pretrial order"); *Hargett v. Valley Fed. Sav. Bank*, 60 F.3d 754, 763 (11th Cir. 1995) (holding that the statute of limitations defense was not waived for failing to plead in the answer because the party plead the defense in the pretrial order and the other party was not unreasonably surprised by the defense). As shown in the Second Circuit cases discussed in the text, these cases do not reflect the prevailing view of this circuit.

involving the same parties or their privies, and (4) involving the same claim. *In re Indesco Int'l, Inc.*, 354 B.R. 660, 664 (Bankr. S.D.N.Y. 2006) (citing *Anaconda v. Hessen* (*In re Teltronics Srvs., Inc.*), 762 F.2d 185, 190 (2d Cir. 1985) (establishing the required elements for *res judicata*). Furthermore, in the bankruptcy context, the court must also consider "whether an independent judgment in a separate proceeding would 'impair, destroy, challenge, or invalidate the enforceability or effectiveness' of the reorganization plan." *Corbett v. MacDonald Moving Servs., Inc.*, 124 F.3d 82, 88 (2d Cir. 1997) (quoting *Sure-Snap Corp. v. State St. Bank and Trust Co.*, 948 F.2d 869, 875-76 (2d Cir. 1991)).

It is well settled that a bankruptcy court's order confirming a chapter 11 plan is treated as a final judgment on the merits with full *res judicata* effect. *Goldin Assoc., LLC v. Donald, Lufkin & Jenrette, Inc.*, No. 00 Civ. 8688, 2004 WL 1119652, at *2 (S.D.N.Y. May 20, 2004) (citing *Sure-Snap Corp.*, 948 F.2d at 872-73) (holding that the provisions of a confirmed plan under section 1141(a) of the Bankruptcy Code binds the debtor and all other parties to the proceeding, which "therefore, constitutes a final judgment on the merits entitled to preclusive effect under the doctrine of *res judicata*"). Section 1141(a) of the Bankruptcy Code provides that a confirmed plan binds the debtor and all other parties to the bankruptcy proceeding as to all of "the plan's provisions, and all related . . . claims which could have been litigated in the same cause of action." *See Sure-Snap Corp.*, 948 F.2d at 873; 11 U.S.C. § 1141(a).[12] Consequently, all parties that were privy

---

[12] Section 1141(a) provides:
   [T]he provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

11 U.S.C. § 1141.

to the Plan are bound by the Plan and are precluded from later raising claims that could have been raised prior to confirmation. *In re Indesco Int'l, Inc.,* 354 B.R. at 664-65 (citing to *Sure-Snap*, 948 F.2d at 873) (noting that a confirmed plan binds the debtors and its creditors as to all of the Plan's provisions and all related claims which could have been litigated in the same cause of action).

In the instant case, the Plaintiff's chapter 11 plan cannot be considered a final judgment on the merits for Defendants because Defendants are not bound by the Plan. Defendants were not creditors or a party in interest in the chapter 11 case and therefore are not bound by it. Further, there is no identity of parties between the bankruptcy case and the adversary proceeding. *See LJM2 Co-Inv., L.P. v. Dodson* (*In re LJM2 Co-Inv., L.P.*), 327 B.R. 786, 792 (Bankr. N.D. Tex. 2005) (holding that the doctrine of *res judicata* did not apply when the defendant did not file a proof of claim in the bankruptcy case and was not otherwise a party to the bankruptcy case). Therefore, Defendants cannot now assert the doctrine of *res judicata* as a shield to protect them from litigating the claims against them.

### D. Plaintiff Has Standing

Upon review of the Plaintiff's chapter 11 plan, Defendants' challenge to Plaintiff's standing to bring suit must fail. Plaintiff's standing to sue is challenged on two grounds. First, Defendants assert that Plaintiff lacks standing to litigate these causes of action because section 5.13 of the Plaintiff's chapter 11 plan transferred all "Other Actions" and "Avoidance Actions" to the Unsecured Creditor Trust. Defendants assert that Plaintiff's causes of action falls into the definition of "Other Actions," preventing the

Plaintiff from bringing suit.  Second, Defendants assert that all other property of the

Plaintiff's estate not otherwise distributed by the Plan's effective date was vested in

Reorganized Cross Media, an entity that Defendants assert is separate and apart from the

Plaintiff.  The Court will address each issue in turn.

Section 1141(b) of the Bankruptcy Code states that "[e]xcept as otherwise

provided in the [chapter 11] plan or the order confirming the plan, the confirmation of the

plan vests all of the property of the estate in the debtor."  11 U.S.C. §1141(b).  Section

1123 of the Bankruptcy Code governs the contents of the chapter 11 plan.   Section

1123(b)(3)(A) and (B) provide as follows:

> (b) Subject to Subsection (a) of this section a plan may-- . . .
> (3) provide for --
> (A) the settlement or adjustment of any claim or interest belonging to the debtor
> or to the estate; or
> (B) the retention and enforcement by the debtor, by the trustee, or by a
> representative of the estate appointed for such purpose, of any such claim or
> interest.

11 U.S.C. § 1123(b)(3)(A) & (B).

Unless a chapter 11 plan provides for the retention and enforcement of a claim or interest

in an entity other than the debtor, the claim will vest in the reorganized debtor.

Section 5.13(a) of the Plaintiff's chapter 11 plan, "Transfer of Rights of Action,"

states in pertinent part:

> (a) Except as otherwise specifically provided in this Plan, in accordance with
> section 1123(b) of the Bankruptcy Code, on the effective Date, the Debtors shall
> transfer the Other Actions and Avoidance Actions . . . to the Unsecured Creditor
> Trust. . . . The Unsecured Trust Administrator shall retain and may exclusively
> enforce any and all such Avoidance Actions and Other Actions transferred, and
> shall have the exclusive right to pursue, institute, abandon settle or compromise
> any and all such Avoidance Actions or Other Actions transferred.

(*Plaintiff's Third Amended Joint Plan*, §5.13, p. 19 (May 19, 2004)).

Plaintiff has raised six different tort related causes of action against CAB Marketing, BCM partnership and Carol Bolak.[13]  Defendants assert that Plaintiff lacks standing because these claims are included in the definition of "Other Actions" and were therefore transferred to the Unsecured Trust Administrator for enforcement.  "Other Actions" is defined in the Plan as:

> [A]ll actions, causes of action, suits or claims of the Debtors or their estates arising under any theory of law or equity, including for breach of contract, breach of fiduciary duty, negligence, tort or otherwise, with respect to former officers and directors of the Debtors or subsidiaries of the Debtors or that may be satisfied from that certain directors' & officers' insurance policy, or against prepetition professionals or agents of the Debtors (other than parties released under the Plan).

(*Plaintiff's Third Amended Joint Plan*, § 1.61, p. 7).

As evidenced from the language in the Plan, this definition does not encompass all actions against *any* prospective defendant, but it could include Carol Bolak if the Plan considered prepetition former employees to be agents of the Plaintiff.  Under the Plan definition of "Other Actions," Plaintiff transferred all claims "arising under any theory of law or equity" against "prepetition agents of the Debtors" to the Unsecured Creditor Trust.  Since Carol Bolak was a former prepetition employee of the Plaintiff, as a matter of contract construction, if the term employee is used interchangeably with the term agent, then all claims against Carol Bolak will fall into the category of "Other Actions" and Plaintiff will lack standing to pursue these claims.

The Plaintiff's chapter 11 plan and the accompanying disclosure statement (hereinafter the "Disclosure Statement") use the term "agents" and "employees" in many

---

[13]    The causes of action that Plaintiff has raised, all relating to Plaintiff's customer lists, are: common law misappropriation, misappropriation of trade secrets, unfair competition, tortuous interference with Plaintiff's existing and potential business relations, unjust enrichment, and diversion of corporate opportunity by Carol Bolak.

different contexts.[14]  There are several instances in both the Disclosure Statement and the

chapter 11 plan where the words "agent," and "employee" are used consecutively.[15]

Furthermore, there are several instances in the chapter 11 plan where the drafters will

only refer to either "agents" or "employees" without referring to the other.[16]  From these

examples, and from additional instances in both the Plan and the Disclosure Statement,

the Court concludes as a matter of contract construction that the drafter did not intend for

the usage of these terms to be interchangeable.  As the definition of "Other Actions" only

includes claims against "former officers and directors of the Debtors" or against

"prepetition professionals or agents," and excludes claims against prepetition employees,

---

[14]    Since the definition of "Other Actions," refers to "agents" with a lower-case "a" the court must
determine what the drafters intended this term to mean.  The use of the term "Agent" with an uppercase
"A" is a defined term in the Plan.

[15]    Section L paragraph 4 of the Disclosure Statement states that "all holders of Claims and Equity
Interests and other parties in interest, along with their respective present or former *employees, agents,*
officers, directors, or principals, shall be enjoined from taking actions to interfere with the implementation
or consummation of the Plan."  *Disclosure Statement,* § L ¶ 4 (emphasis added).  In the section providing
for a limited release of the Creditor's Committee and Professionals, the Disclosure Statement states that
"each of their respective current *agents,* current *employees,* and current representatives shall be released by
the Debtors."  *Disclosure Statement,* § L ¶ 6.  Section 11.6 of the chapter 11 plan, also directed at limited
releases of the Creditor's Committee and Professionals, contained identical language.  Section 11.6 also
provides that "each of their respective current *agents,* current *employees,* and current representatives shall
be released by the Debtors."  *Plaintiff's Third Amended Joint Plan,* §11, p. 32 (emphasis added).  In
providing for the release of the Agent and Lender, the Plan states that "the Former Agent and Former
Lenders and counsel to the Agent and Lenders and Former Agent and Former Lenders and each of their
respective *agents, employees,* attorneys and representatives shall be release by the Debtors and the Debtors'
estates, each of their *agents, employees,* attorneys and representatives."  *Plaintiff's Third Amended Joint
Plan,* § 11.6, p. 32 (emphasis added).

[16]    The following sections make reference to agents without referring to employees.  Section 6.1 of
the Plan provides that, "the various transfer registers for each of the classes of Claims or Equity Interests as
maintained by the Debtors or their *respective agents* shall be deemed closed."  *Plaintiff's Third Amended
Joint Plan,* § 6, p. 23  (emphasis added).  Section 8.3 provides that "a Claim for such damages . . . shall not
be enforceable against the Debtors, or their respective properties or interests in property as *agents,*
successors, or assigns."  *Id.* § 8, p. 29 (emphasis added).  The following sections in the Plan only refer to
employees.  Section 5.11(c) provides that "[a]ny professionals retained or other *employees* hired by the
Plan Administrator shall be entitled to reasonable compensation for services rendered . . . .  The payment of
fees and expenses of the Plan Administrator and its retained professionals and *employees* shall be made in
the ordinary course of business."  *Id.* § 5.11, p. 18-19 (emphasis added).  The Exculpation clause in section
11.5 provides in relevant part that "[o]n the Effective Date, the respective current officers, current directors,
*current employees,* current members, current financial advisors, current financial advisors, current
attorneys, as applicable, of the Debtors . . . shall be exculpated."  *Id.* § 11.5, p. 32 (emphasis added).

all claims against Carol Bolak are not encompassed in the definition.  Therefore, the

Court concludes that the claims remained property of the Plaintiff, and Plaintiff has

standing to bring suit.[17]

Defendants also challenge Plaintiff's standing to bring suit based on the theory

that other property of the estate not otherwise distributed by the Plan's effective date was

vested in Reorganized Cross Media, an entity that Defendants assert is separate and apart

from the Plaintiff.  The Court must look elsewhere in the Plan to determine if

Defendants' second challenge to Plaintiff's standing has merit.  Under sections 5.7 and

5.11(b)(iv) of the Plan, the remaining causes of action are vested in Reorganized Cross

Media.[18]  The Court must now determine if Plaintiff and Reorganized Cross Media are

substantially the same entity, entitling the Plaintiff to bring these causes of action against

Defendants.  Defendants assert that Plaintiff, the debtors in possession, are a separate

---

[17]      Under the confirmed chapter 11 liquidation plan and the Disclosure Statement, Cross Media's unsecured creditors were to receive, among other things, 85 percent (85%) of proceeds, if any, from the Avoidance Actions and Other Actions.  *Disclosure Statement*, § II, p. 3-4.  Cross Media's Lenders, SummitBridge National Investments LLC and Signature Bank, would receive 15 percent (15%) of the net recovery from any Avoidance Actions or Other Actions up to a total amount of $750,000.  *Plaintiff's Third Amended Joint Plan*, § 1.5, p. 7.  All remaining actions that are not Avoidance Actions or Other Actions vest in Reorganized Cross Media, and are sold, liquidated or disposed of in a matter compatible with the best interests of the Agents and Lenders.  Pl*aintiff's Third Amended Joint Plan*, § 5.7, p. 16.  The Lenders will receive 100% of the recovery from these non-Cash assets.

[18]      Section 5.7 "Vesting of Other Assets," provides:
        Other than Cash and as provided under the Plan, the property of the Debtors' estate not otherwise distributed as of the Effective Date shall be vested in Reorganized Cross Media on the Effective Date.  Such property shall continue to be subject to the jurisdiction of the Bankruptcy Court.  The Plan Administrator shall sell or otherwise dispose of, and liquidate or convert into Cash, any non-Cash assets of the Debtors' estates in a manner compatible with the best interests of the Agent and the Lenders.
*Plaintiff's Third Amended Joint Plan*, § 5.7, p. 16.

Section 5.11(b) "Rights, Powers and Duties of Reorganized Cross Media and the Plan Administrator," provides in relevant part:
        Reorganized Cross Media shall retain and have all the rights, powers and duties necessary to carry out its responsibilities under this Plan. . . . [S]uch rights, powers and duties shall include: (iv) initiating or continuing litigation to recover amounts due to Cross Media.
*Plaintiff's Third Amended Joint Plan*, §5.11, p. 17.

entity from Reorganized Cross Media and, therefore, Plaintiff lacks standing to bring

these claims.  To support Defendants' argument, they point to sections 1.24, 5.7, 5.8 and

12.1(n) and (q) of the Plan to emphasize that the Plan explicitly recognizes that the

debtors in possession and Reorganized Cross Media are distinct entities because the Plan

refers to them separately.[19]  This argument is largely formalistic.  To determine whether

or not the entities are the same the court must look to the substance of the Plan.

Sections 5.3[20] of the Plan addresses the status of Reorganized Cross Media and

makes clear that "Cross Media shall continue to exist as Reorganized Cross Media after

the Effective Date."  It simply requires Cross Media to amend its Charter and By-Laws to

reflect the merger with former subsidiary Media Outsourcing.  *See, e.g,. In re Boston*

*Reg'l Med. Ctr., Inc.,* 410 F.3d at 104 n. 1 (noting that the debtor and the reorganized

debtor were not distinct legal entities, but that the reorganized entity was the continuation

of the original entity as reorganized)*; see also Tennessee Wheel and Rubber Co. v.*

*Captron Corporate Air Fleet (In re Tennessee Wheel and Rubber Co.)*, 64 B.R. 721, 725

(Bankr. M.D. Tenn. 1986) (holding that the "'reorganized debtor' is the same corporation

indistinguishable from the 'debtor' for § 1123 purposes").  The debtors in possession and

Reorganized Cross Media are at times referred to separately in the Plan because when the

---

[19]     For example, Defendants cite to section 1.24, "Contributed Assets," which refers to "the Debtors, Newco or Reorganized Cross Media or holders of Credit Facility Claims," when addressing possible reserves and remittances of assets.  *Plaintiff's Third Amended Joint Plan*, § 1.24, p. 3.  Section 5.7 provides that "the property of the Debtors' estate not otherwise distributed as of the effective date shall be vested in Reorganized Cross Media on the Effective Date." *Plaintiff's Third Amended Joint Plan,* § 5.7, p. 16.  The Defendants argue that since the Plan refers to them separately they are separate entities.

[20]     Section 5.3, "Continued Corporate Existence; Amended and Restated Charter and By-laws; Dissolution of Reorganized Cross Media," provides that: "Cross media shall continue to exist as Reorganized Cross Media after the Effective Date in accordance with the laws of the State of Delaware and pursuant to the Amended Charter and By-laws to be filed with the Bankruptcy court as part of the Plan Supplement."  *Plaintiff's Third Amended Joint Plan*, § 5.3, p. 14.

Plan refers to the "Debtors" it refers to the pre-confirmation debtors, and when it refers to

Reorganized Cross Media, it is referring to the post confirmation merged entity.

Therefore, Plaintiff has standing to bring the remaining five causes of action against CAB

Marketing.

### E.  The Rule 15 Motion to Amend the Pleadings is Granted

In Plaintiff's post-trial memorandum of law, it moved pursuant to Rule 15(b) of

the Federal Rules of Civil Procedure to amend and conform the pleadings to the evidence

presented at trial, arguing that the parties expressly consented in the joint pretrial order to

try issues relating to the BCM Partnership.[21]  Rule 15(b) is "mandatory, not merely

permissive," and requires that "issues that are tried, though not raised in the pleadings, be

treated as though they were raised in the pleadings."  *Ostano Commerzanstalt, v.*

*Telewide Sys., Inc.,* 880 F.2d 642, 646 (2d Cir. 1989) (quoting *SEC v. Rapp,* 304 F.2d

786, 790 (2d Cir. 1962) (Hand, J.)).  The objective of the rule is to decide cases based on

the actual dispute between the parties.  *Id.*; 6A Wright, Miller & Kane, FEDERAL

PRACTICE AND PROCEDURE CIVIL  § 1493 (2d ed. 1990) (an amendment brings the

pleadings in line with the issues that were actually developed at trial).  Any issues

actually tried by express or implied consent at the hearing on the merits must be treated in

---

[21]      Rule 15(b) provides in relevant part:
          **(b) Amendments to Conform to the Evidence.** When issues not raised by the pleadings are tried
          by express or implied consent of the parties, they shall be treated in all respects as if they had been
          raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to
          conform to the evidence and to raise these issues may be made upon motion of any party at any
          time, even after judgment; but failure so to amend does not affect the result of the trial of these
          issues.
Fed. R. Civ. P. 15(b).

all respects as if they had been raised in the pleadings.  *O'Brien v. Moriarty*, 489 F.2d

941, 943 (1st Cir. 1974).

In considering whether to allow an amendment pursuant to Rule 15(b), the court

must consider "whether the new issues were tried by the parties' express or implied

consent and whether the defendant would be prejudiced by the implied amendment . . . ."

*United States v. 890 Noyac Rd.*, 945 F.2d 1252, 1257 (2d Cir. 1991) (citations omitted).

Express consent may be found in a stipulation or pretrial order, and implied consent may

be found where evidence is introduced at trial without objection.  *Casey v. Lewis*, 43 F.3d

1261, 1269 (9th Cir. 1994), *rev'd on other grounds,* 518 U.S. 343 (1996); *Telewide Sys.,*

*Inc.,* 880 F.2d at 646 (concluding that the addition of a new plaintiff after close of trial on

damages did not result in prejudice to defendants, because the multiple references to the

party in the pretrial order put defendants on notice);  *Rodriguez v. Doral Mortg. Corp.*, 57

F.3d 1168, 1172 (1st Cir. 1995) (finding that consent is implied if at trial "a party

acquiesces in the introduction of evidence which is relevant only to that issue" and the

parties understood that the evidence was aimed at an unpleaded issue) (citations omitted);

*see generally* 6A FEDERAL PRACTICE AND PROCEDURE CIVIL  § 1493 ("[E]xpress consent

may be given by stipulation, or may be incorporated in a pretrial order").  For the

defendant to be prejudiced by the Rule 15(b) amendment, a party's failure to plead an

issue that it later presents must disadvantage its opponent in its case.  *New York State*

*Elec. & Gas Corp. v. Sec'y of Labor*, 88 F.3d 98, 104-05 (2d Cir. 1996).  Generally, a

party cannot show that it suffered prejudice simply because of a change in its opponent's

legal theory.  *Id.* at 105 (finding no prejudice where the material fact issues would be the

same regardless whether it was tried on the preliminary or amended theory).

Plaintiff's motion to amend the pleadings to have it conform to the evidence presented at trial is granted because Defendants stipulated to certain facts regarding the BCM partnership in the pretrial order (PTO at 8), the issue of BCM's liability was clearly identified as a legal issue for trial (PTO at 19), and without any objection from Defendants, several witnesses testified about the BCM partnership at trial.[22]  The purpose of Plaintiff's motion is to modify its legal theory to impose liability on Bolak both vicariously because of the alleged misconduct of other BCM partners and based on her own allegedly tortious conduct.  Defendants were on notice that Plaintiff was seeking to impose liability on Bolak through the BCM partnership and they defended by challenging the formation of a partnership in the factual contentions in the pretrial order (PTO at 16-17), and at trial during the direct examination of Carol Bolak and Marcella Jones.  *See supra,* n. 22.  Further, at trial, Defendants failed to object when Plaintiff raised issues on cross-examination relating to the BCM partnership.[23]  Therefore, Defendants explicitly and implicitly consented to try issues relating to the BCM partnership at trial, and Defendants are not prejudiced by the amendment.  The material facts at issue are the same regardless whether the Court considers the original or the new theory of liability.  Therefore, the Court deems the pleadings amended to include claims against the BCM partnership for misappropriation of trade secrets, unfair competition, tortious interference with business relations, and unjust enrichment.

---

[22]     Both Marcella Jones and Carol Bolak testified about BCM.  *See* Jones testimony (Tr. (12/5) at 22-25, 26, 27-28, 30-31, 33, 39) and Bolak testimony ( Tr. (12/5) at 76, 84, 97, 98, 106-108).

[23]     Defendants now object to the amendment on the grounds that Brad Barlow is an indispensable party, and that allowing Plaintiff's new theory would prejudice the Defendants by exposing them to the possibility of inconsistent judgments.  (Defendants' Post-Trial Memorandum of Law, at 24).  The Court is not persuaded by Defendants' argument.  Defendants were well aware that Plaintiff intended to focus on issues relating to BCM partnership and it is likely that Defendants chose not to implead Barlow because, instead, they sought to impute any tortious misconduct to Barlow.

### F.  Choice of Law

The Court will apply New York state law to all of the state law causes of action alleged.  None of the parties raised any choice of law issues in the pleadings, joint pretrial order or post-trial briefing.  For the most part, the parties briefed the issues applying New York law.  The Plaintiff was a Georgia corporation with its principal place of business in Georgia.  Bolak, Jones and Barlow were employed by Cross Media in Georgia, and the alleged tortious conduct took place in Georgia.  The Court raised the choice of law issue during the closing arguments.  (Tr. (2/7) at 5).  The parties then agreed that the Court should apply New York law.  (Tr. (2/7) at 5); *see Am. Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130, 134 (2d Cir. 1997) ("[w]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry."); *Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 52 (2d Cir. 1984) ("[I]n the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied.").  Therefore, the Court will apply New York law.

### G.  Plaintiff Has Failed to Prove Its Claims By a Preponderance of the Evidence

Finally, reaching the merits of the claims, the Court concludes that Plaintiff has failed to prove any of its claims by a preponderance of the evidence.  Each claim will be examined in turn, but the overriding conclusion is that Plaintiff failed to establish that Bolak, or in the case of the activities of the BCM partnership for which Bolak may be chargeable, that Bolak, Barlow, Jones, or anyone else acting on behalf of the partnership,

took or converted any of Cross Media's trade secrets or corporate opportunities in the form of its customer lists.

Plaintiff offered no direct evidence, by testimony or documents, that Defendants took or converted any trade secrets from Cross Media.  While it is clear from the earlier *Nixon* adversary proceeding that Cross Media's customer lists were improperly taken by someone – Nixon, and for all the Court knows, by others as well – no direct evidence was presented to show that these Defendants took the lists.  The uncontroverted evidence shows that Cross Media *suspected* Bolak of diverting potential customer leads, or of participating with or assisting others in doing so.  (PX 7 at 10-12; PX 8 at 8-9).  Bolak's employment with Cross Media was terminated based on these suspicions.  (Tr. (12/5) at 57).  But suspicions are not enough to establish misappropriation or the other alleged torts by a preponderance of the evidence as required for liability.[24]

The closest Plaintiff has come to establishing any liability on the part of Defendants arises from the proof relating to a single Cross Media customer, Sandy Frey.  Frey testified as a witness for Plaintiff at trial that Barlow's company, A Magazine Café, contacted her by telephone in Spring 2004 (after Cross Media closed its renewal department), misrepresenting itself as her magazine subscription service, seeking to place an order for magazines.  (Tr. (12/4) at 20).  Frey testified that the caller had confidential information about her that Cross Media had, including her credit card number.  *Id.*  In response to the call, Frey placed an order for magazines with A Magazine Café.  *Id.*  The order was "cleared" by Bolak's company, defendant CAB (through CRC of Canton),

---

[24]    Plaintiff never attempted to impose liability on Defendants for diversion of prospective customer leads.  Even if Plaintiff attempted to argue that customer leads were a protectable trade secret that is covered under the misappropriation claim, Plaintiff failed to provide sufficient evidence to establish that customer leads are a protectable trade secret.

which charged Frey's credit card for the purchase.  (Tr. (12/4) at 20-23).  Frey then

became suspicious and upset, calling Cross Media and advising it about the call.  (Tr.

(12/4) at 21-22).  Frey then cancelled the order with A Magazine Café, and her money

was refunded.  (Tr. (12/4) at 27-28; PX 2 at 490).  Cross Media admitted at trial that it

suffered no damages as a result of this transaction.  (Tr. (2/7) at 32).

When and how A Magazine Café received information about Frey, utilized in the

telephone call to Frey, was never established at trial.  While it could well have come in

some way at some time from Cross Media, it likewise could have come from some other

source, as Frey purchased products from other telemarketers as well.[25]  (Tr. (12/4) 43, 46,

106-07; PX 1 at 488-490).  Plaintiff was unable to offer any proof that Bolak, Barlow,

Jones, or anyone else who was associated with Cross Media took or obtained the

information about Frey from Cross Media and gave it to A Magazine Café.

Over the life of its magazine subscription business, Cross Media had 944,000

names apparently reflected in its computerized customer lists.  (PTO at 14).  Because of

the shut-down and liquidation of Cross Media's business following its bankruptcy,

Plaintiff was unable to offer proof of the actual customer lists.  (PX 16 at 26-28).

Apparently, no paper copies ever existed (Tr. (12/4) at 128), and Plaintiff's evidence

established that neither Bolak nor Barlow or any BCM partner had access to or the ability

to copy or download Cross Media's electronic customer list files because of security

protection built-in to the system.  (Tr. (12/4) at 78, 123, 126-27).  Under these

circumstances, while Plaintiff cannot be faulted for its inability to produce the customer

---

[25]     At trial, Marcella Jones testified that one customer could come from various lead sources. (Tr.
(12/5) at (unavailable)).  If the customer is an impulse buyer, then the customer's name might appear on
several lead lists from sales of exercise equipment, vitamins, or other sources.  *Id.*

lists during discovery or to offer the lists in evidence at trial, Plaintiff also cannot be excused from meeting its evidentiary burden in proving its claims.

As part of its liquidation, Cross Media sold 391,000 past-due customer accounts (part of its much larger customer lists) to Cavalry. (PX 26 at 11). Only seven former Cross Media customers from this list had matching names and addresses to names found on CAB's 1,450 name customer list. (PX 26 at 18-25). Plaintiff acknowledged that it did not contact any of these matches other than Frey to find out whether Defendants made any improper solicitations of these customers, and Plaintiff offered no other evidence to support liability against Defendants for these accounts. No evidence was presented that any additional names on CAB's list matched names on Cross Media's full customer lists.

In short, the Court is left at most with some proof that one of 944,000 Cross Media customers *may* have been improperly solicited by or on behalf of Defendants resulting in a single transaction totaling $24.57 that was promptly reversed and for which Plaintiff admits that it suffered no damages. (PX 2 at 489-90; Tr. (2/7) at 32).

While the Court has concluded that judgment should be entered for Defendants on all claims because of the failure of the proof, the Court will nevertheless briefly address each of the theories of liability advanced by Plaintiff. Plaintiff asserts that Bolak is liable vicariously as a partner of BCM for tortious conduct by Barlow in furtherance of the partnership business, and that she and CAB are also liable directly based on her own conduct. As explained below, the Court concludes that Plaintiff has succeeded in proving that the BCM partnership existed, and that Bolak would therefore be liable vicariously for tortious acts committed by Barlow in furtherance of the partnership business if the proof supported that conclusion. Plaintiff, however, failed to prove that Barlow on behalf of

the BCM partnership misappropriated Cross Media's trade secrets.  Plaintiff also failed to

prove that Bolak and CAB are liable directly for Bolak's own conduct as Plaintiff failed

to prove that Bolak misappropriated the customer lists.

### H.  Bolak Would Be Jointly and Severally Liable As a BCM Partner

At trial, Bolak disputed the existence of the BCM partnership, and also disputed

that Plaintiff established any actionable wrongs by BCM for which she could be liable.

To demonstrate the existence of a partnership, a plaintiff must prove four

elements: (1) the parties' sharing of profits and losses; (2) the parties' joint control and

management of the business; (3) the contribution by each party of property, financial

resources, effort, skill, or knowledge to the business; and (4) the parties' intention to be

partners.  *Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y.

2004).  No one factor is dispositive; it is necessary to examine the parties' relationship as

a whole.  *Kyle v. Brenton*, 584 N.Y.S.2d 698, 698 (N.Y. App. Div. 1992).

The trial testimony of Marcella Jones and Carol Bolak, and the deposition

testimony of Brad Barlow introduced at trial, along with supporting documentary

evidence, established that the parties intended to and did form a partnership.  *See* (PX 9

at 101-04, 119-20) (Barlow's testimony regarding the formation of the partnership).  Both

Jones and Bolak admitted that it was the parties' intent to create a partnership.  (Tr. (12/5)

at 23, 39, 97).  In email correspondence between the parties they referred to each other as

partners and indicated that money left after expenses was to "pay back partners."  (PX 11

at 308-309).  At one point, the parties contemplated trying to create a formal agreement.

(Tr. (12/5) at 24).  Evidencing that the partners shared joint control and management, the

BCM partners attempted to hold regular meetings to discuss the business affairs of the

partnership, including the number of orders that had been cleared and how the partnership

could obtain additional subscription orders.  (Tr. (12/5) at 24-25, 97; PX 9 at 152-153).

The partners also scheduled a meeting to discuss costs and division of profits.  (PX 11 at

305-306).

Furthermore, there is considerable testimony to substantiate the claim that each

partner contributed property, financial resources, effort, skill, or knowledge of the

business, in further support of the existence of the partnership.  Jones testified that each

partner contributed equal amounts of time toward making the partnership work and

confirmed each partner's individual contribution to the partnership.  (Tr. (12/5) at 25-28).

Jones contributed her prior experience in sales and her relationship to dealers like Tom

Meehan and others.  (Tr. (12/5) at 27).  Barlow was experienced in renewing magazine

subscriptions, and it was his job to renew magazine subscriptions received from Tom

Meehan.  (Tr. (12/5) at 25-27).  Robert Bolak contributed his knowledge of the magazine

business and he also acted as a sales manager.  (Tr. (12/5) at 28).  And Carol Bolak

contributed her contract with PPSB, which allowed the partnership to clear orders.  *Id.*

Most telling, both Jones and Barlow attested to the fact that each of the BCM

partners was entitled to and received a 25% share of the profits.  (Tr. (12/5) at 30; PX 9 at

101-104, 197).  It was established in Bolak's testimony and in emails documenting

partnership distributions, that profits were split equally among the four parties. (PX 11 at

308-309; Tr. (12/5) at 97, 107-108).  In a December 2, 2004 email from Carol Bolak to

Barlow, Jones and Marsha Mann, the partnership's accountant, Bolak informed Barlow

of an unaccounted for balance and informed him that he was entitled to ¼ of that amount.

(PX 11 at 308).  After indicating that she, Jones and Robert Bolak were paid their share,

she also stated that Donnie West was due a one-time payment for work done for A Magazine Café since West "was not a partner and not entitled to any compensation from profits . . . ." *Id.* Although no evidence was presented indicating that the partners agreed to equally share in the losses, evidence that each individual receives a share of profits is *prima facie* evidence that the individual is a partner in the business. *Olson v. Smithtown Med. Specialists, P.C.,* 602 N.Y.S.2d 649 (N.Y. App. Div. 1993) (holding that sharing of profits is prima facie evidence that an individual is a partner in the business, as long as these profits were not received by an employee as wage payments); *see* N.Y. PARTNERSHIP LAW § 11 [4] [b] (McKinney 2006). There is no evidence that any partner was being paid as an employee. Plaintiff has established by a preponderance of the evidence that the relevant parties formed and functioned as a partnership for the relevant time period.

As a partner in the BCM partnership, under New York law, Carol Bolak would be jointly and severally liable for the wrongful acts or omissions performed by another partner while acting in the ordinary course of partnership business. N.Y. PARTNERSHIP LAW § 24 (McKinney 2006); N.Y. PARTNERSHIP LAW § 26(a) (McKinney 2006) (partners are held jointly and severally liable for acts chargeable to the partnership under § 24). Under New York law, general partners have joint and several liability for torts committed by the partnership, and plaintiff may bring an action against the partner individually, and does not have to sue the partnership first. *Lewis v. Rosenfeld,* 138 F. Supp. 2d. 466, 476 (S.D.N.Y. 2001).

While Plaintiff proved by a preponderance of the evidence the existence of the

BCM partnership, Plaintiff failed to prove misappropriation of the customer lists either

by Bolak or by Barlow or someone else acting on behalf of CAB or the BCM partnership.

### I.   Plaintiff Failed to Prove Misappropriation of a Trade Secret by Bolak or Barlow

A plaintiff claiming misappropriation of a trade secret must prove: (1) it

possessed a trade secret, and (2) defendant is using that trade secret in breach of an

agreement, confidence, or duty, or as a result of discovery by improper means.

*Integrated Cash Mgmt Services, Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 173 (2d

Cir. 1990); *Cross Media Marketing Corp. v. Nixon,* Adv. Proceeding No. 03-08278 (ECF

# 69) (Bankr. S.D.N.Y. April 6, 2006), *aff'd,* No. 06 Civ. 4228, 2006 WL 2337177, at *1.

Under New York law, "a trade secret may consist of any formula, pattern, device or

compilation of information [that] is used in one's business, and [that] gives [the owner]

an opportunity to obtain an advantage over competitors who do not know or use it."

*Houbigant, Inc. v. Dev. Specialists*, *Inc.,* 229 F. Supp. 2d 208, 221 (S.D.N.Y. 2002)

(quoting RESTATEMENT (FIRST) OF TORTS § 757 cmt. b (1939)); *North Atlantic*

*Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999).

In determining whether information constitutes a trade secret, New York courts

have considered the following factors:

> (1) the extent to which the information is known outside of the business;
> (2) the extent to which it is known by employees and others involved in
> the business; (3) the extent of measures taken by the business to guard the
> secrecy of the information; (4) the value of the information to the business
> and its competitors; (5) the amount of effort or money expended by the
> business in developing the information; (6) the ease or difficulty with
> which the information could be properly acquired or duplicated by others.

*Integrated Cash Mgmt. Servs.,* 920 F.2d at 173.

In a reprise of its evidence in the earlier *Nixon* case, Plaintiff has easily established by a preponderance of the evidence that its customer lists were protected trade secrets. For the reasons given by Judge Lifland in *Nixon*, and affirmed by the District Court in that case by Judge Mukasey, I find that Cross Media's customer lists were protected trade secrets.

In *Nixon*, the evidence was clear that the defendant misappropriated Cross Media's entire customer lists, offering them for sale over the internet. *Nixon,* 2006 WL 2337177, at *5. The evidence was equally clear that Nixon's husband had access to all of Cross Media's customer lists through computer consulting services he performed for Cross Media. *Id.*

In this case, the same protected trade secrets are at issue, but the Plaintiff failed to prove by a preponderance of the evidence that the customer lists were misappropriated by the Defendants, or by Barlow or anyone else acting for the BCM partnership.

### 1.  Plaintiff Failed to Prove that Bolak Misappropriated the Customer Lists

Bolak was employed by Cross Media as a lead broker. (PTO at 5). Her duties included purchasing names of potential magazine subscribers and distributing a revised list to targeted dealers. (PTO at 5; Tr. (12/5) at 48-49, 51-52). In the winter and the following spring of 2002, Cross Media began to monitor the activity of suspected employees, including Bolak, due to a noticeable decline of verified sales. (PX 7 at 10-12). Bolak was ultimately fired in 2003, but was not fully informed of the circumstances

for her firing.  (Tr. (12/5) at 57-58).  When Bolak heard rumors that she had been fired

for theft and fraud, she contacted Andy Nelson, to whom she had reported, to explain the

conduct that management may have misinterpreted.  (Tr. (12/5) at 58-64; DX L 20-22).

Bolak had been contacting dealers that Cross Media was no longer doing business with

due to downsizing, and helped them place business with magazine dealers directly.  (DX

L at 20-22; PTO at 8) ("After Cross Media began downsizing its business . . . [it] reduced

the number of brokers from whom the company acquired leads and Cross Media reduced

the number of dealers to whom the company sold leads.").  Bolak explained that any

suspicious communication between her and Donnie West, a former Cross Media

employee with whom she was romantically involved, was to put West in contact with

these former dealers.  (Tr. (12/5) at 62-63; DX L at 20-22).  Nelson understood that her

only misconduct was conducting personal business at work.  (DX L at 20-22, 23, 34).

Nelson promised Bolak that he would, and did, clear up any confusion about her

termination, and testified at deposition that Bolak had been fired for conducting personal

business during working hours.  (DX L at 20-22).

    Even if Bolak diverted leads to other dealers, Plaintiff has not established that

these leads were part of Plaintiff's customer lists.  (Tr. (12/4) at 66-67) (explaining that

customer lists are different from leads in that a customer list speaks to the unique

attributes of a customer after they've gone through the entire [described] process").

Instead, Plaintiff attempts to use the business and an allegedly personal relationship

between Bolak and West to establish that West was remotely accessing the customer lists

through Ricky Wilson, a domain administrator who had access to all systems at Cross

Media.  (Tr. (12/4) at 136, 138, 150).  However, Plaintiff failed to provide any evidence

establishing that it was possible to remotely access and download Cross Media's customer lists.  Plaintiff introduced testimony of Chris Hamburg, the former vice president of operations, who said that Wilson's activities were being monitored, but Plaintiff failed to provide any evidence that Wilson had downloaded the customer lists. (Tr. (12/4) at 122-136).  Plaintiff's suspicions about Bolak, West or Wilson are not a substitute for proof.  Therefore, Plaintiff's has failed to prove by a preponderance of the evidence that Bolak, on her own behalf or on behalf of CAB, misappropriated Plaintiff's customer lists.

### 2. Plaintiff Failed to Prove That Barlow Misappropriated The Customer Lists

The evidence failed to establish that Barlow had access to Cross Media's customer lists.  Chris Hamburg testified that when Barlow returned to Cross Media as renewal manager, when that business was reopened after the bankruptcy filing, Barlow's access was limited to the renewals and reclamations modules of the customer lists.  (Tr. (12/4) at 78).  The renewals modules only included information about those customers whose payment structure was about to be completed and was up for renewal.  (Tr. (12/4) at 77-78).  The reclamation modules only included information as to customers who during the verification process cancelled their magazine order – the Cross Media representative would attempt to reclaim these orders by selling the customers a smaller bundle.  (Tr. (12/4) at 125-26).  Further, if Barlow wished to copy even this customer information, he would have had to print each customer form individually – his access did not allow him to download the entire renewal list.  (Tr. (12/4) at 78-79).  No evidence

was presented that Barlow printed-out or took information about even this limited subset of customers from Cross Media's customer lists.

The only evidence of possible misconduct by Barlow relates to the solicitation of an order from Sandy Frey by Barlow's business, A Magazine Café, already discussed above, *see supra,* at Section G, which is insufficient to establish liability for misappropriation of Cross Media's customer lists. The solicitation of Frey is a troublesome episode, but not enough to predicate liability against Defendants in this case.

During trial Defendants tried to distance themselves from Barlow and A Magazine Café. (Tr. (12/5) 39-40, 42, 77, 79). Bolak and Jones testified that Barlow created A Magazine Café on his own, and that they were not affiliated with it. (Tr. (12/5) 26, 79-80). According to Bolak and Jones, the purpose of the BCM partnership was limited to clearing orders from Tom Meehan, but the evidence shows that the partnership benefited from clearing at least 600-700 orders from A Magazine Café that were not Meehan orders. (Tr. (12/5) 26-27, 76). The Court concludes that the testimony by Bolak and Jones about their lack of involvement with A Magazine Café is not credible. Rather, A Magazine Café was an entity that Barlow established to utilize his skills to benefit the BCM partnership. The email correspondence between Bolak, Jones, Barlow and Marsha Mann (PX 11 at 308) indicates that as early as December 2, 2004, the BCM partners were aware of A Magazine Café, and the partners had loaned the company money for its operations. *Id.* Bolak writes in reference to the money received, and monies due to other partners, "[h]ere is what we have now that we have paid back all monies loaned to AMC. . . . We also agreed to pay Donnie [West] a one time payment of $ 1500 for work that was done for AMC since he is not a partner and not entitled to compensation from profits

and was never paid for services due him." *Id.*  The court understands the reference to "AMC" to mean "A Magazine Café."

The Court is left with a clear sense that neither Bolak nor Jones was entirely truthful in their trial testimony.  Barlow, with whom Bolak and Jones had a serious falling-out, was likewise not a credible witness.  But the Court's discomfort about the testimony of these witnesses is not enough to overcome the lack of proof of misappropriation by or on behalf of Defendants.  Plaintiff has simply failed to prove that Barlow, acting on behalf of the BCM partnership, misappropriated Cross Media's customer lists.

### J.  Plaintiff Failed to Prove Unjust Enrichment

Plaintiff cannot establish a claim for unjust enrichment because it failed to establish that Defendants misappropriated Plaintiff's customer lists.  The elements of an unjust enrichment claim under New York law are (1) a benefit to the defendant, (2) at the Plaintiff's expense, and (3) that "equity and good conscience" require restitution.  *Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir. 2000).  The "essence" of this claim "is that one party has received money or a benefit at the expense of another." *Id;* (citing *City of Syracuse v. R.A.C. Holding, Inc.,* 685 N.Y.S.2d 381, 381 (N.Y. App. Div. 1999)).  Since Plaintiff failed to establish that Defendants have, at the Plaintiff's expense, taken Plaintiff's trade secret, Plaintiff therefore cannot establish that Defendants acquired a benefit or were enriched at Plaintiff's expense.  Furthermore, with respect to any unjust enrichment claim that may be alleged with regard to Sandy Frey, it is undisputed that Defendants never received a benefit from Frey or that Plaintiff was not damaged by the

call to Frey, because Cross Media had been paid in full for Frey's magazines and when

she was contacted in March, Cross Media had already closed its renewal department.

(Tr. (12/4) at 82).  Plaintiff's claim for unjust enrichment necessarily fails.


### K.  Plaintiff Failed to Prove Unfair Competition

Plaintiff's claim for unfair competition, based on the misappropriation claim, also

must fail.  The essence of unfair competition under New York common law is "the bad

faith misappropriation of the labors and expenditures of another, likely to cause

confusion or to deceive purchasers as to the origin of the goods."  *Rosenfeld v. W.B.

Saunders*, 728 F. Supp. 236, 249–250 (S.D.N.Y. 1990) (quoting *Computer Assocs. Int'l,

Inc. v. Computer Automation, Inc.,* 678 F. Supp. 424, 429 (S.D.N.Y. 1987)).  In an action

for damages based on a common law unfair competition claim, the plaintiff must show

actual confusion to recover.  J*effrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d

27, 35 (2d Cir. 1995).

At trial, Plaintiff failed to prove that Defendants misappropriated the customer

lists.  Therefore, Plaintiff solely relies on the argument that Defendants, through the BCM

partnership, engaged in deceptive marketing by "falsely representing" to Plaintiff's

customer, Sandy Frey, that they were her magazine subscription company.  (Pl.

Memorandum of Law, at 31; Tr. (12/4) at 20-21).  Although Frey testified that the

company that called her in March identified itself as her "magazine subscription

company," the caller never identified the company as MOS or Cross Media.  (Tr. (12/4)

at 36-37).  In fact, when Frey called MOS to verify if they had changed their name, in the

recorded conversation Frey said, "I got a call from somebody saying they are ACI

Magazine.  Is that you guys?"  (PX 1 at 0002).  Furthermore, Plaintiff has admitted that it

suffered no damage with respect to the loss of Sandy Frey as a customer.  (Tr. (2/7) at

32).

Plaintiff also cannot establish the "bad faith" requirement for its unfair

competition claim.  Plaintiff asserts that bad faith is clearly established through the

misappropriation of Plaintiff's customer lists, but since the Court has not found that

Defendants misappropriated the customer lists, the Court does not find that the alleged

deception was done in bad faith.  Plaintiff has failed to establish that Defendants deceived

any other former Cross Media customers.  Therefore, this claim also fails.

### L.  Plaintiff Failed to Prove Tortious Interference with Business Relationships

Plaintiff has failed to establish by a preponderance of the evidence that

Defendants have tortiously interfered with Plaintiff's existing business relations.  To

prevail on a claim for tortious interference with existing business relations, a plaintiff

must establish: (1) the existence of a valid contract between plaintiff and a third party; (2)

the defendant's knowledge of that contract; (3) the defendant's intentional procuring of

the breach, and (4) damages.  *White Plains Coat & Apron Co., v. Cintas Corp*., 460 F.3d

281, 285 (2d Cir. 2006); *Foster v. Churchill,* 665 N.E.2d 153, 156 (N.Y. 1996).  Courts

have dismissed tortious interference claims where the plaintiff has failed to identify

specific contracts that were breached as a result of the defendant's actions.  *Fun-*

*Damental Too, Ltd. v. Gemmy Indus. Corp*., No. 96 Civ. 1103, 1996 WL 724734, at *3

(S.D.N.Y. Dec. 17, 1996) (dismissing the claim for tortious interference of contract

because plaintiff failed to allege specific contracts that were breached as a result of

defendants' action) (citing *Campo v. 1st Nationwide Bank,* 857 F. Supp. 264, 273 (E.D.N.Y. 1994) ("The Proposed Amended Complaint does not allege the existence of any specific contracts with identified third-parties . . . .")). Here, the only existing contract that Plaintiff could potentially show Defendants interfered with is the contract with Sandy Frey.[26]  Even with respect to Frey, Plaintiff's claim fails.

At trial, Plaintiff established that a valid contract existed between Cross Media and Frey.  (Tr. (12/4) at 7-19; PX 1 at 02-04).  However, it is also clear from the evidence that as of February 2004, Frey's existing account was paid in full.  (PX 1 at 02-04). Further, Plaintiff cannot allege that Defendants tortiously interfered with the renewal of Frey's magazine subscriptions because Cross Media terminated its renewal department in February 2004, and Frey was not contacted by the Defendants for a possible renewal until March 2004.[27]  (Tr. (12/4) at 20).  Instead, Plaintiff relies on Frey's testimony that "after the problem that I had with my credit card, I cancelled all of my magazine subscriptions with MOS, CRC and everybody," (Tr. (12/4) at 40), to establish that Frey cancelled her subscription with MOS.  However, at this point in the contractual relationship, the only performance left on the contract was on behalf of MOS.  According to Frey's testimony, after speaking with MOS, she understood that her bill was paid in full, and that her subscription was good for another year.[28]  (Tr. (12/4) at 39).  Therefore, if Frey did

---

[26]     Further, in Plaintiff's Post-trial Memorandum of Law, Plaintiff limits the argument to tortious interference of contract to Sandy Frey, and does not attempt to extend this argument to other alleged customers.  (Pl. Post-trial Memorandum, at 32).

[27]     Plaintiff cannot as a matter of law assert that Defendants tortiously interfered with prospective business relations with respect to Frey because Plaintiff closed its renewal department before Frey's contract was up for renewal.  (Tr. (12/4) at 82).   Therefore, Plaintiff had no intention of renewing Frey's subscriptions in the future.

[28]     After Frey was asked whether she believed her subscriptions were paid up when she received her statements from MOS, she stated that: "[o]nly after the conversation I had with MOS – after I called them

actually cancel her subscription with MOS, Frey may be the only damaged party if MOS did not send her the magazines that she had rightfully paid for in advance.[29]

Plaintiff admits that it has not suffered any actual damages with respect to Frey, but instead is seeking punitive damages for the alleged misconduct. (Tr. (2/7) at 32; Pl. Post-Trial Memorandum, at 32-33). The Court does not need to reach the issue of punitive damages, because Plaintiff cannot establish the third element of the claim, that Defendants intentionally procured the breach of the contract.[30] Plaintiff cannot establish this element because there was no requirement that Frey breach her existing contract with MOS in order to execute a new contract with the Defendants. In effect, Frey executed a new agreement with Defendants that had no bearing on Frey's prior contract with MOS. If Frey had not contacted MOS about ACI, both contracts would have run simultaneously. Plaintiff has failed to establish that Defendants had the requisite intent to cause the breach of the contract with Frey, because the procurement of the new contract with Frey did not require a breach of the prior contract. Therefore, Plaintiff's claim for tortious interference with existing business relations fails.

### M. Plaintiff Failed To Prove Diversion of a Corporate Opportunity

Plaintiff failed to establish by a preponderance of the evidence that Carol Bolak diverted corporate opportunities from Plaintiff. Under the doctrine of corporate

---

that day. She said that my magazine subscription had been paid up and was good for another year and I wasn't going to get another bill for it." (Tr. (12/4) at 39).

[29]     If this is the case, MOS may have benefited to Frey's detriment, because it was required to pay for and deliver a years worth of a magazine bundle.

[30]     The facts do point to some evidence that Defendants may have had knowledge of Plaintiff's prior contract because Plaintiff was aware that Frey was paying $ 15 a month for magazines. (PX 1 at 02).

opportunity, "corporate fiduciaries and employees cannot, without consent, divert and

exploit for their own benefit any opportunity that should be deemed an asset of the

corporation." *Design Strategies, Inc. v. Davis,* 384 F. Supp. 2d 649, 671-72 (S.D.N.Y.

2005) (quoting *Alexander & Alexander of New York, Inc. v. Fritzen*, N.Y.S.2d 530, 533-

534 (N.Y. App. Div. 1989). This doctrine still applies even after an employee leaves her

corporate employment, but the scope of the fundamental duty is determined by the

circumstances of each case and does not run to every act where the employee appears to

act in her own self-interest. *American Federal Group, Ltd. v. Rothenberg*, 136 F.3d 897,

906 (2d Cir. 1998). Taking steps not involving any neglect of positive duties to a current

employer in preparation for engaging in competition with that employer after the

employee leaves the employment may not involve breach of fiduciary duties. *Id.;*

*Schneider Leasing Plus, Inc. v. Stallone,* 569 N.Y.S.2d 126, 128 (N.Y. App. Div. 1991).

An employee does cross the line by actively soliciting the customers of her *current*

*employer* and diverting her *current employer's* business to herself. *American Fed.*

*Group,* 136 F. 3d at 906 (emphasis added).

The corporate opportunity doctrine prohibits a former employee from utilizing

information obtained in a fiduciary capacity to appropriate a business opportunity

belonging to the corporation. *American Fed. Group,* 136 F. 3d at 906. However, the

doctrine of corporate opportunity is limited to situations where the corporation has an

"interest" or "tangible expectancy" in the opportunity. *Design Strategies,* 384 F. Supp.

2d at 672 (explaining this to mean "something much less tenable than ownership, but . . .

more certain than a desire or a hope"). Further, although a former employee is not barred

from competing with a former employer, a former employee may not misappropriate and

utilize confidential information, such as customer lists and other confidential information

not generally known to the public, but available only to employees in their employment

capacity.  *American Fed. Group,* 136 F.3d at 906 (citing *Abraham Zion Corp. v. Lebow,*

593 F. Supp. 551, 569-70 (S.D.N.Y. 1984)).  However, a former employee may utilize

information obtained while employed, including the identity of customers, if the

information is generally available from public sources to members of the trade, without

breaching a fiduciary duty of loyalty to the former employer.  *Abraham Zion Corp.,* 593

F. Supp. at 570.

Plaintiff failed to prove that Bolak misappropriated the confidential customer lists

from Plaintiff while employed at Cross Media, or at any time thereafter.[31]  Therefore,

Plaintiff's claim of diversion of corporate opportunity cannot rest on this factor and

ultimately fails because of this.  *See, e.g., Schneider Leasing Plus, Inc. v. Stallone,* 569

N.Y.S.2d 126, 128 (N.Y. App. Div. 1991) ("An employee may create a competing

business prior to leaving his employer without breaching any fiduciary duty unless he

makes improper use of the employer's time, facilities or proprietary secrets in doing so.")

Plaintiff fundamentally failed to establish a factual basis for the diversion of a

corporate opportunity.  While it is true that Bolak did owe a fiduciary duty to Plaintiff,

the only possible evidence relating to the diversion of customers occurred close to a year

after Bolak was terminated from Cross Media.  (PX at 29).  Therefore, the evidence does

not support the contention that Bolak diverted these customers for her own benefit while

employed at Cross Media.  Although Bolak formed CAB Marketing in October 2002,

during her employment at Cross Media, this is insufficient to establish that Bolak

---

[31]     This last claim for diversion of corporate opportunity was only brought against Bolak, not against
CAB Marketing or BCM.

breached a fiduciary duty to the company, because the entity did not begin operating until after Bolak stopped working for Cross Media.  (Tr. (12/5) at 64-65).  Therefore, Plaintiff has failed to prove that Bolak diverted corporate opportunities from Plaintiff.

## III.    CONCLUSION

For the foregoing to reasons, Defendants are entitled to have judgment entered in their favor on all claims asserted against them.  Defendants' counsel shall prepare and present a judgment in accordance with this opinion.


DATED:        April 25, 2007
              New York, New York



                        **/s/Martin Glenn**
                        MARTIN GLENN
                 United States Bankruptcy Judge